

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| MATTHEW WALTER PITT and KIMBERLY JEAN YANCEY-PITT, | ) ) ) | ED103723 |
| Plaintiffs/Garnishors/Respondents, | ) ) | |
| v. | ) ) ) | Appeal from the Circuit Court of the City of St. Louis |
| WILLIE LEONBERGER, | ) ) ) | |
| Defendant/Judgment Debtor/ Respondent, | ) ) | Honorable David L. Dowd |
| and | ) ) ) | |
| MISSOURI UNITED SCHOOL INSURANCE COUNCIL, | ) ) ) | Filed: February 7, 2017 |
| Defendant/Garnishee/Appellant. | ) ) | |

<u>Introduction</u>

Missouri United School Insurance Council (MUSIC) appeals from three trial court judgments. First, MUSIC appeals from the trial court's January 6, 2015 Order Granting Garnishors' (Matthew Walter Pitt and Kimberly Jean Yancey-Pitt, collectively the Pitts) Motion for Partial Summary Judgment and Denying MUSIC's Motion for Summary Judgment on the issue of coverage for the Pitts' negligent wrongful death judgment against school bus driver Willie Leonberger (Leonberger) for negligently causing the death of the Pitts' son, Hunter Pitt,

by failing to instruct Hunter Pitt how to safely disembark the school bus Leonberger was driving and then negligently running him over (Points I-IV). Second, MUSIC appeals from the trial court's May 12, 2015 Order and Judgment finding MUSIC liable for the entire negligent wrongful death judgment, including the 5.25% post-judgment interest awarded on the $11,494,637.38 wrongful death judgment in favor of the Pitts against Leonberger on December 21, 2012 by the wrongful death court and 9% prejudgment interest issued by the garnishment court on the original judgment plus post-judgment interest accumulated to date from the time the original judgment became final and payable on January 21, 2013, but unpaid by MUSIC, which exceeds the $2,500,000 contractual liability limit of coverage for accidents (Point V). In its May 12, 2015 Order and Judgment, the garnishment court also issued a Pay-In-Order directing MUSIC to pay the total amount into the court's registry, which it refused to do, leading to the next judgment. Third, MUSIC appeals from the trial court's July 27, 2015 Final Judgment in Garnishment against MUSIC awarding prejudgment interest and including the accumulated amount of post-judgment interest imposed by the wrongful death court on the Pitts' original negligent wrongful death judgment of $11,494,637.38 against Leonberger on December 21, 2012 for a total of $15,618,946.12 (Points VI and VII). We affirm in part, modify in part, and remand for further proceedings.

Factual and Procedural Background

Leonberger drove a school bus for the North Callaway R-1 School District (District). On January 18, 2011, Leonberger was driving the bus when he accidentally struck and killed six-year-old student Hunter Pitt after he disembarked the bus. Hunter Pitt and his older sister, Dakota Yancey, were two of the students on Leonberger's daily bus route. After exiting the bus in the afternoon, Hunter Pitt would usually cross the street first and his sister would follow. On

2

January 18, 2011, after Hunter Pitt and Dakota Yancey had exited the bus, Leonberger saw that Dakota had crossed and assumed Hunter had also crossed. Hunter Pitt had not yet crossed and when the bus pulled forward it struck him. Hunter Pitt died from his injuries. Leonberger was unaware the bus had struck Hunter Pitt until another student told him to stop.

At the time, Leonberger was insured by the District under a general liability and automobile liability insurance policy issued by MUSIC, a business entity that insures school districts and their employees. The "2011 MUSIC Plan Document" (the Policy) provided coverage which was occurrence-based and the Policy defined "occurrence" to mean "accident," but did not define "accident." The Policy had limits of $2,500,000, and MUSIC had contracted with insurer United Educators (UE) to provide all coverage in excess of $500,000. Leonberger, a district school bus driver, was a "Covered Party" under the Policy. Coverage A of the Policy provided: "We will pay on behalf of a Covered Party all Damages up to the Limit of Liability as a result of an Occurrence in the Coverage Territory."

On January 19, 2011, MUSIC was informed of the accident and immediately accepted coverage for the loss. Claims adjuster Debra Walker (Walker) told Leonberger he was covered under the Policy, MUSIC would hire a lawyer for him, and MUSIC would take care of it. MUSIC completed its investigation on January 26, 2011, concluding: "Coverage is applicable…No exclusions apply… investigation revealed 90 to 100% fault on the bus driver. Lost sight of claimant and rolled forward over him."

On February 3, 2011, MUSIC notified UE of the accident, which assigned claims attorney Rhonda Hurwitz (Hurwitz) to the file. Nearly three months later, MUSIC learned a local prosecutor was considering charging Leonberger with second-degree involuntary manslaughter for Hunter Pitt's death, premised upon grossly negligent conduct related to

3

Leonberger's driving. When it learned of this, internal documents revealed MUSIC believed Hunter Pitt's death was a "horrible accident" and a "mistake," but "not criminal." Nonetheless, MUSIC concluded it would "be in our interests to defend" and "control ... the criminal matter ... since the outcome could impact [the civil] claim."

On March 30, 2011, MUSIC further noted: "We recently learned that the prosecuting attorney is looking at the case for pressing charges against the bus driver. Clearly [Leonberger] made a mistake, but it certainly is not criminal." MUSIC later noted: "hopefully any jury will see this as it is, a horrible accident and not criminal." Walker discussed the possibility of a charge with her supervisor, Anita Khiene (Khiene), noting, "I talked with [Khiene] about the same, she said it would be in our interest to defend him should that occur and I agree."

MUSIC learned the Pitts had retained counsel on April 4, 2011. MUSIC retained counsel Gerard Noce (Noce) to represent Leonberger and UE requested a separate attorney, Robert Numrich (Numrich), represent the District for any civil litigation brought by the Pitts.

On May 20, 2011, a local prosecutor charged Leonberger with second-degree involuntary manslaughter under Section 565.024.3.[1] MUSIC hired criminal attorney Rusty Antel (Antel) to represent Leonberger in the criminal proceeding. MUSIC stated it thought it was prudent to exercise control over the criminal matter since the outcome could impact the claim. After the charge, MUSIC's supervising adjuster Chris Brading (Brading) directed Walker to try and get a demand from the Pitts' counsel because she thought it would be better to settle the case prior to the outcome of the criminal charge.

In the criminal proceeding, Antel, the attorney MUSIC hired to represent Leonberger, advised Leonberger to plead guilty. MUSIC learned Leonberger would do so in October of

---

[1] All statutory references are to RSMo 2000, unless otherwise indicated.

2011. Prior to the plea, Leonberger requested MUSIC settle all claims against him within the policy limits if the opportunity arose. At no time prior to the plea did MUSIC tell Leonberger that following Antel's advice would affect his coverage. On November 21, 2011, Leonberger pled guilty to the charge of second-degree involuntary manslaughter upon Antel's advice.

On November 28, 2011, Hurwitz stated "the felony plea appears to wipe out MUSIC coverage for [Leonberger] under exclusion 19(o)." Exclusion 19(o) reads:

This Coverage Agreement does not apply to and we are not liable for:

Any fraudulent, dishonest, malicious, criminal or intentional wrongful act or omission by a Covered Party.

MUSIC responded: "I had expressed some concern over the 'criminal act' exclusion when we conferenced last week. I thought we could leverage it with [the Pitts] as indicated in the call. I thought it may help us get around [the Pitts' attorney] if [Leonberger] ends up with no coverage."

UE requested a draft reservation of rights letter. MUSIC noted in an internal document that:

Our [i]ntention all along was to get this to mediation. Now however, it appears UE may want to issue a reservation of rights due to the alleged criminal act of [Leonberger]. He may have been charged due to pressure by the family in this matter, but he was not convicted. This 79-year-old man pled out to keep from going to prison for involuntary manslaughter. The fact of the matter is, he was still in the course and scope of his duties as a district employee when this unfortunate accident occurred.

On December 20, 2011, the Pitts demanded MUSIC's policy limits. MUSIC said it wanted to mediate but the Pitts refused.

On January 18, 2012, the Callaway County Circuit Court sentenced Leonberger to four years, suspended execution of sentence subject to five years of unsupervised probation and

5

community service. At the sentencing hearing, the circuit court stated: "[a]nd everybody agrees on one thing, this was an accident." After the plea, MUSIC continued to note that "coverage is applicable…[n]o exclusions apply."

On January 20, 2012, Walker noted "we are going to discuss strategy going forward as [the Pitts] absolutely decline mediation. [Numrich] has relayed to [the Pitts' attorney] that MUSIC is not going to tender their limits." On February 14, 2012, the Pitts filed their wrongful death suit against Leonberger, the District, the District transportation manager and superintendent, alleging two separate claims against Leonberger for negligence and negligence per se. The negligence count asserted 16 separate acts of negligence against Leonberger with regard to both his driving and his failure to train Hunter Pitt on how to exit the bus and cross the street safely. The Pitts alleged at least one of these negligent acts directly and proximately caused Hunter Pitt's death. The venue of the lawsuit was changed four times until it ended up in the City of St. Louis Circuit Court.

On February 18, 2012, MUSIC learned the Pitts had filed suit and noted: "[Leonberger] pleaded guilty to the [second-degree involuntary manslaughter charge in Callaway County] and now [UE] is advising that since [Leonberger] pleaded guilty to stay out of jail, [UE] says now there is no coverage for [Leonberger]."

Noce, Leonberger's civil counsel provided by MUSIC, stated, "I do believe this was an accident without any reckless behavior on the part of Leonberger." On March 1, 2012, Noce emailed Walker and Khiene stating he had scheduled a meeting with Leonberger to review the petition. Khiene responded, "Frankly if we do not have the issue with UE resolved prior to the meeting, I am not certain I would want [Walker] there either. I will ask [Brading] to see if we can get a call scheduled with UE counsel [Hurwitz] asap."

6

On March 6, 2012, the conference between MUSIC and UE took place. On March 6, 2012, Walker noted regarding the conference held between MUSIC and UE that day: "Conference call was held. The plan going forward is [to] take the stance that coverage will be denied to [Leonberger]. This will leave [the Pitts'] recovery limited to the statutory cap which is now about $395K. That will give us leverage going forward to force this to mediation. We can say either go to mediation or coverage will be denied to [Leonberger]."

Walker, on behalf of MUSIC, prepared a reservation of rights letter. The letter advised MUSIC had a right to deny coverage based on Exclusion 19(o). Walker stated "it just makes me sick at heart to do it…." The letter was not sent to Noce or Leonberger.

On March 8, 2012, Noce entered his appearance in the wrongful death case filed by the Pitts against Leonberger. On March 16, 2012, Noce filed an Answer for Leonberger at MUSIC's direction, which admitted liability.

The Pitts made a second policy limits demand on April 4, 2012. MUSIC issued the reservation of rights letter that same day. However, it never sent the reservation of rights letter to Noce or Leonberger. Noce and Leonberger did not learn MUSIC was reserving its right to deny coverage until three months later.

On April 20, 2012, MUSIC stated, "In addition, we have had to issue a reservation of rights to [Leonberger] as UE will deny coverage for his 'criminal act.' That has been sent out. [Numrich] has let [the Pitts' attorney] know that if he proceeds, coverage to the bus driver will be denied and he will be left with the statutory cap of $395k."

On July 10, 2012, the Pitts' counsel contacted Noce to advise that if there was a reservation of rights, the Pitts would be interested in a Section 537.065 agreement.[2] Noce told MUSIC he was not aware of a reservation of rights. UE counsel Hurwitz responded that a reservation of rights had been issued. This was the first time Noce or Leonberger became aware there was a reservation of rights. Likewise, this was the first time Leonberger learned there was any issue regarding his coverage.

On July 19, 2012, Noce demanded the reservation of rights be withdrawn. In response, Walker emailed UE's counsel Hurwitz the following: "It is my recommendation we rescind the reservation of rights and defend this matter. Otherwise, we are on the hook for not only the policy limits, but a Bad Faith Claim against MUSIC."

UE's Hurwitz refused, and then contrary to its own recommendation, MUSIC decided, "At this time we are going to file [a declaratory judgment] action to get ruling if bus driver is covered and not withdrawing our reservation of rights letter. We are going to offer cap plus interest to [Noce] with him knowing that there might be chance there is no coverage for

---

[2] Section 537.065 provides a claimant and tort-feasor may contract to limit recovery to specified assets or insurance contract:

Any person having an unliquidated claim for damages against a tort-feasor, on account of bodily injuries or death, may enter into a contract with such tort-feasor or any insurer in his behalf or both, whereby, in consideration of the payment of a specified amount, the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person, firm or corporation claiming by or through him will levy execution, by garnishment or as otherwise provided by law, except against the specific assets listed in the contract and except against any insurer which insures the legal liability of the tort-feasor for such damage and which insurer is not excepted from execution, garnishment or other legal procedure by such contract. Execution or garnishment proceedings in aid thereof shall lie only as to assets of the tort-feasor specifically mentioned in the contract or the insurer or insurers not excluded in such contract. Such contract, when properly acknowledged by the parties thereto, may be recorded in the office of the recorder of deeds in any county where a judgment may be rendered, or in the county of the residence of the tort-feasor, or in both such counties, and if the same is so recorded then such tort-feasor's property, except as to the assets specifically listed in the contract, shall not be subject to any judgment lien as the result of any judgment rendered against the tort-feasor, arising out of the transaction for which the contract is entered into.

[Leonberger] to sign the [Section 537.065 agreement] because if there is no coverage for him, he cannot sign a form requesting MUSIC to tender limits."

On July 31, 2012, MUSIC told Noce and Leonberger it would not withdraw the reservation of rights. Leonberger then executed a Section 537.065 agreement with the Pitts.

In September of 2012, MUSIC filed a declaratory judgment action in Callaway County seeking a declaration that the Policy afforded no coverage to Leonberger. It then settled the claims as to the District, transportation manager and superintendent, but not Leonberger. On April 30, 2013, the Callaway County Circuit Court dismissed the declaratory judgment action with prejudice based on the pending garnishment proceedings in the circuit court of the City of St. Louis, which would decide the matter of coverage.

On December 3, 2012, the Pitts tried their negligence claim against Leonberger in the City of St. Louis Circuit Court (sometimes referred to as "wrongful death court"). Prior to the commencement of the bench trial, the Pitts dismissed Count II of their first amended petition, leaving only Count I, alleging wrongful death based in negligence. The trial court received evidence pertaining only to Count I of the Pitts' first amended petition, including allegations that Leonberger negligently drove the bus and failed to train Hunter Pitt.

On December 21, 2012, the trial court in the City of St. Louis entered its Amended Findings as to Certain Issues and Final Judgment in favor of the Pitts and against Leonberger in the amount of $11,494,637.38, with costs taxed against Leonberger and post-judgment interest at a rate of 5.25% per annum. In paragraph 3 of its judgment, the trial court specifically found Leonberger's duties included the duty to train school bus riders, including Hunter Pitt, the established safety procedures for unloading a school bus and crossing the street, including the requirement that, each time one exited the bus, he or she must walk ten steps forward and away

9

from the front of the bus and remain there until given a hand signal by the bus driver indicating it was safe to cross the street. The trial court found this duty was an established and continuing duty of which Leonberger was aware from 2010 up until and through the day of the accident on January 18, 2011, and which he failed to fulfill. The trial court found Leonberger breached this duty and his failure to train Hunter Pitt was a "failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances," resulting in actionable negligence. The court explicitly noted "[Leonberger's] negligence, as herein found to exist, is based upon mere tort negligence and was not 'criminal negligence' as that term is defined by RSMo. 562.016; and 'criminal negligence' is not an element of [Leonberger's] negligent failure to train Hunter Pitt in the manner referenced to in paragraph 3."

On January 21, 2013, the date the underlying judgment became final, the Pitts filed a Rule 90 garnishment proceeding against MUSIC for the full amount of the underlying judgment and interest in the City of St. Louis Circuit Court (Case No. 1222-CC09848). On June 3, 2015, Leonberger filed his first amended petition against MUSIC and UE for bad faith failure to settle, bad faith failure to defend, and breach of the fiduciary duty between insurer and insured in the City of St. Louis Circuit Court (Case No. 1322-CC01344). The parties filed cross-motions for summary judgment on the issue of coverage in both the garnishment case (the Pitts versus MUSIC) and in the bad faith case (Leonberger versus MUSIC and UE). The motions were argued simultaneously, and the trial court took judicial notice of its files in both cases.

On January 6, 2015, the trial court sustained the Pitts' motion for summary judgment on coverage based on four separate grounds and denied MUSIC's cross-motion for summary judgment alleging no coverage. This judgment is on appeal in this case in Points I – IV. On the same date, the trial court sustained Leonberger's motion for summary judgment on coverage in

10

his bad faith case on the same grounds and denied MUSIC and UE's cross-motion for summary judgment. This case is still pending.

With coverage resolved, the Pitts (Garnishors), Leonberger, and MUSIC (Garnishee) appeared before the court on February 3, 2015, to discuss resolution of the Pitts' garnishment action. All parties stipulated Garnishors and Garnishee would each file a proposed "Pay-In-Order" with the court. The court found when the underlying wrongful death judgment, including its post-judgment interest issued by the wrongful death court on January 21, 2012, became final on January 21, 2013, the amount owed by MUSIC became fixed, liquidated and readily determinable. Accordingly, pursuant to Section 408.020, the garnishment court awarded prejudgment interest at the rate of 9% per annum from January 21, 2013, the date the underlying judgment became final. The court determined the underlying judgment was $11,494,637.38; the post-judgment interest awarded against Leonberger as part of the wrongful death judgment at a rate of 5.25% had accumulated to $1,441,703.76; the 9% prejudgment interest the garnishment court adjudged applicable to the garnishment judgment in the garnishment proceeding pursuant to Section 408.020 amounted to $2,682,604.98; for a grand total of $15,618,964.12. On May 12, 2015, the court entered an Order and Judgment finding MUSIC liable for extra-contractual damages above and beyond the Policy's coverage limits based on MUSIC's wrongful denial of coverage, failure to settle and defend, and pursuit of a declaratory judgment in Callaway County Circuit Court that no coverage exists, and issued a Pay-In-Order pursuant to Rule 90.10.[3] This

---

[3]All rule references are to Mo. R. Civ. P. 2015. Rule 90.10 provides: Discharge of Garnishee--Judgment in Garnishment

(a) If the garnishee admits in its answers to interrogatories that any property subject to garnishment is in the garnishee's possession, the garnishee, without further order of the court, shall pay or deliver such property into court or to the attorney for the party on whose behalf the order of garnishment was issued not later than ten days after the return date of the writ of garnishment or levy or, in the case of a continuous wage garnishment, not later than ten days after the end of each pay period subject to the garnishment. Timely payment or delivery of such property into

judgment is on appeal in this case primarily via Point V, and partially in Points VI and VII. MUSIC refused to comply with the Pay-In-Order and the court entered a Final Order Judgment on July 27, 2015.[4] MUSIC appeals from this third judgment in Points VI and VII, and to some extent in Point V.

## Points on Appeal

In its first point, MUSIC claims the trial court erred in granting the Pitts' motion for summary judgment and denying its motion for summary judgment on the issue of coverage because the Pitts failed to show as a matter of law their claim for wrongful death was a covered claim and the record established as a matter of law their wrongful death claim was not a covered claim under the Policy, in that Exclusion 19(o) expressly excludes coverage for claims arising out of a criminal act and Leonberger pled guilty to a criminal act for the conduct causing the

---

court thereby discharges the garnishee from further liability on account of the property subject to garnishment so paid or delivered.

(b) If the garnishor files exceptions to the garnishee's answers to interrogatories or if a third party has intervened as provided by Rule 90.09, the court or jury shall determine all controverted issues raised by garnishor's exceptions to the garnishee's answers to interrogatories, the garnishee's response thereto, and any claim asserted by a third party who has intervened. The court shall enter judgment in accordance with the findings of the court or jury and shall order that any property not previously delivered to the officer or the court be delivered to the officer or paid into court or to the attorney for the party on whose behalf the order of garnishment was issued within such time as the court shall direct. If the property is not delivered to the officer or paid into court or to the attorney for the party on whose behalf the order of garnishment was issued within such time, the court may enter judgment against the garnishee for the value of the property.

[4] On July 29, 2015, UE wrote Leonberger's counsel purporting to demand and initiate arbitration pursuant to a provision in the FRA contract, which states:
> If any dispute should arise between the Reinsured and the Reinsurer with reference to the interpretation of this Agreement or their rights with respect to any transaction involved whether such dispute arises before or after termination of this Agreement, such dispute, upon the written request of either party shall be submitted to [an arbitration panel].

Leonberger filed a motion to stay the threatened arbitration proceeding and UE filed a competing motion to compel arbitration. On October 15, 2015, the court granted Leonberger's motion and denied UE's motion. We affirmed this decision on appeal in Leonberger v. Missouri United School Insurance Council, 501 S.W.3d 1 (Mo.App. E.D. 2016).

12

death of Hunter Pitt, and application of Exclusion 19(o) to the Pitts' wrongful death claim does not make coverage under the Policy illusory.

In its second point, MUSIC maintains the trial court erred in granting the Pitts' motion for summary judgment and denying its motion for summary judgment on the issue of coverage based on the concurrent proximate cause rule, because the concurrent proximate cause rule does not apply in this case, in that Leonberger's guilty plea precludes the Pitts from alleging any other theory of causation, the Pitts failed to adequately plead a claim for failure to train, and any alleged failure to train Hunter Pitt was not the natural and proximate cause of his death, which was caused by the intervening, superseding criminal act of Leonberger.

In its third point, MUSIC asserts the trial court erred in granting the Pitts' motion for summary judgment and in denying its motion for summary judgment on the issue of coverage based on its holding MUSIC had a duty to defend Leonberger under the Motor Vehicle Responsibility Law (MVRL), because the MVRL does not impose on MUSIC a duty to defend Leonberger in this case, in that the law is intended to protect injured victims, not insured drivers like Leonberger, and valid policy exclusions like Exclusion 19(o) relieve an insurer of its duty to defend notwithstanding that law's invalidation of such exclusions up to the applicable statutory minimum coverage.

In its fourth point, MUSIC contends the trial court erred in granting the Pitts' motion for summary judgment and denying its motion for summary judgment on the issue of coverage based on its holding MUSIC waived and is estopped from relying on Exclusion 19(o), because the Pitts failed to show the doctrines of waiver and estoppel apply to this case, in that waiver and estoppel cannot be used to create coverage when it does not otherwise exist; nothing in MUSIC's conduct, including hiring defense counsel to defend Leonberger in the criminal action,

13

established MUSIC intended to relinquish a known right; MUSIC did not wait an unreasonable amount of time before issuing its reservation of rights notice; and Leonberger was not lulled into detrimental reliance and did not otherwise change his position based on MUSIC's conduct.

In its fifth point, MUSIC avers the trial court exceeded its jurisdiction and erred in entering judgment against MUSIC in the amount of $15,847,076.43, rather than the remaining Policy limits of $2,107,266, because the judgment included extra-contractual damages which were not available in this Rule 90 proceeding, in that a Rule 90 garnishment in aid of execution is an *in rem* proceeding limited to the collection of property, effects, or money that the garnishee has a present obligation to pay the defendant and does not permit an award of extra-contractual or consequential damages against the garnishee arising from an alleged breach of a duty owed to the defendant, and the only money that MUSIC could have owed under the Policy was the remaining limits of $2,107,266.

In its sixth point, MUSIC argues the trial court erred in awarding prejudgment interest against MUSIC, because the award of prejudgment interest was not proper in this Rule 90 proceeding, in that garnishment in aid of execution is an *in rem* proceeding limited to the collection of property, effects, or money that the garnishee has a present obligation to pay the defendant and therefore prejudgment interest is not available in a Rule 90 proceeding; the Pitts failed to plead or prove their entitlement to an award of prejudgment interest; and the court's award of prejudgment interest while also including the post-judgment interest on the original judgment resulted in an improper double recovery of interest at a rate of over 15% per annum.

In its seventh point, MUSIC claims the trial court erred in awarding the Pitts post-judgment interest at the rate of 9% per annum because only the "tort action" rate should apply to their judgment against MUSIC, in that the Pitts' garnishment in aid of execution is an ancillary

14

proceeding growing out of and dependent upon the underlying wrongful death action and the Pitts' judgment against Leonberger was for negligence, so that the tort action interest rate should apply.

Standards of Review

The interpretation of an insurance policy, and the determination whether coverage and exclusion provisions are ambiguous, are questions of law that this Court reviews *de novo*. Burns v. Smith, 303 S.W.3d 505, 509 (Mo.banc 2010). Where, as here, the trial court granted summary judgment, this Court also applies a *de novo* standard of review. Id. An order of summary judgment may be affirmed under any theory that is supported by the record. Id.

We affirm the trial court's grant of summary judgment for the respondent if the same is correct under any theory supported by the record developed below and presented on appeal. Oakley Fertilizer, Inc. v. Continental Ins. Co., 276 S.W.3d 342, 350 (Mo.App. E.D. 2009).

The interpretation of a contract is a question of law. State v. Nationwide Life Ins. Co., 340 S.W.3d 161, 182 (Mo.App. W.D. 2011). The primary rule in interpreting a contract is to ascertain the parties' intent and give effect to that intent. Id. To ascertain the parties' intent, we rely on the plain and ordinary meaning of the words in the contract and consider the document as a whole. Id.

Our review of whether a party is entitled to prejudgment interest is *de novo*. Watters v. Travel Guard Intern., 136 S.W.3d 100, 111 (Mo.App. E.D. 2004). A determination of the date from which post-judgment interest is due is a question of law that we review *de novo*. Peterson v. Discover Property & Casualty Insurance Company, 460 S.W.3d 393, 413 (Mo.App. W.D. 2015); Lindquist v. Mid-Am. Orthopaedic Surgery, Inc., 224 S.W.3d 593, 594-95 (Mo.banc

15

2007).  In reviewing an issue *de novo*, we do not defer to the trial court.  Peterson, 460 S.W.3d at 413.

Discussion

Points I - IV – Summary Judgment on Coverage

Point I – Coverage for Accidents Causing Bodily Injury and Death

In its first point, MUSIC claims the trial court erred in finding coverage in the MUSIC policy as a matter of law for the Pitts' negligent wrongful death judgment against Leonberger because coverage was nullified by the policy's criminal acts exclusion.

MUSIC concedes Leonberger was a "covered person" under the Policy.  The Policy provides:

> Covered Persons means:
>
> b. at the option of the Member, and except as otherwise provided in this definition, any employee, student teacher, teaching assistant or uncompensated volunteer while acting at the direction of or performing services for or on behalf of the Member with its knowledge and consent; ...
>
> d. any person operating an Automobile owned, borrowed by, leased by, or rented to the Member....

The coverage extended to occurrences.  The Policy defined "occurrence" to mean:

> Occurrence means an accident during the Coverage Period, an event that first occurs during the Coverage Period, or continuous, intermittent or repeated exposure to conditions that commence during the Coverage Period that causes Bodily Injury, Personal Injury or Property Damage neither expected nor intended by the Covered Party.

The Policy did not define "accident."  The Policy defined "Bodily Injury" to mean:

> [P]hysical injury, sickness, disease, disability or death sustained by a person and includes any resulting mental injury, emotional distress or shock; however, Bodily Injury does not mean or include emotional distress or mental injury arising out of or related to discrimination (including sexual harassment) or Wrongful Employment Practices.

16

The "Coverage Agreement", "Coverage A: Occurrence Coverage Bodily Injury Property Damage - Personal Injury" section of the Policy stated MUSIC "will pay on behalf of a Covered Party all Damages up to the Limit of Liability as a result of an Occurrence in the Coverage Territory."

The "Coverage Summary" listed the "Document Period as: 12/31/10-11" and the Policy provides: "Coverage Territory means anywhere provided that, with respect to an Occurrence or Wrongful Act that takes place outside the United States, the liability results from the activities of a Covered Person temporarily outside the United States on Member business and the Covered Party's liability to pay Damages is determined in a suit brought in the United States (including its territories and possessions) or Canada, or in a settlement to which we agree."

The "Coverage Agreement" gave MUSIC "the right and duty to investigate, defend and settle any Claim or Occurrence to which this Coverage Agreement applies."

Under a section entitled "MUSIC's Duty to Defend" the policy stated: "MUSIC has the right and duty to defend, at its own expense, any claim, proceeding or suit against the Member for damages payable under this coverage. MUSIC also has the right to investigate and settle these claims, proceedings and suits. However, MUSIC has no duty to defend if not covered hereunder or if the applicable limit of liability is exhausted."

Thus, the Policy's coverage extended to accidents causing bodily injury, including death, which a covered party becomes legally obligated to pay. Here, Count I of the Pitts' petition against Leonberger alleged negligence causing Hunter Pitt's death. The Pitts obtained judgment in their favor and against Leonberger solely on Count I premised on Leonberger's act of negligence that resulted in Hunter Pitt's death. Prior to trial, the Pitts dismissed Count II of their

17

first amended petition, which was premised on Leonberger's guilty plea to a charge of second-degree involuntary manslaughter.

A liability policy restricting coverage to an occurrence, defined as an accident, encompasses a negligence claim. When a liability policy defines occurrence as meaning accident, Missouri courts consider this to mean injury caused by the negligence of the insured. Wood v. Safeco Ins. Co. of America, 980 S.W.2d 43, 49 (Mo.App. E.D. 1998). The determinative inquiry into whether there was an "occurrence" or "accident" is whether the insured foresaw or expected the injury or damages. Assurance Co. of America v. Secura Ins. Co., 384 S.W.3d 224, 234 (Mo.App. E.D. 2012). There are no legal degrees of negligence in civil judgments. Fowler v. Park Corp., 673 S.W.2d 749, 755 (Mo.banc 1984); Virginia D. v. Madesco Investment Corp., 648 S.W.2d 881, 886 n. 11 (Mo.banc 1983). Accordingly, the Pitts' negligence judgment against Leonberger is covered by the MUSIC policy as a matter of law. MUSIC admitted as much on January 26, 2011, when it conceded no exclusions applied "and coverage otherwise applied on that date." The trial court found the accident resulting in Hunter Pitt's wrongful death was caused by Leonberger's negligence as alleged in the Pitts' first amended petition, namely that Leonberger breached his duty to train Hunter Pitt how to properly exit the bus, which was a "failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances," resulting in actionable negligence. The court explicitly noted "[Leonberger's] negligence, as herein found to exist, is based upon mere tort negligence and was not 'criminal negligence' as that term is defined by RSMo. 562.016; and 'criminal negligence' is not an element of [Leonberger's] negligent failure to train Hunter Pitt."

The trial court did not err in finding the Policy covered the Pitts' claims against Leonberger. "It is well-settled Missouri law that when a 'liability policy defines occurrence as

18

meaning accident Missouri courts consider this to mean injury caused by the negligence of the insured.'" Stark Liquidation Co. v. Florists' Mut. Ins. Co., 243 S.W.3d 385, 393 (Mo.App. E.D. 2007), citing Wood, 980 S.W.2d at 49.  "As we have noted, '[i]n its more general sense the term accident does not exclude human fault called negligence, but is recognized as an occurrence arising from the carelessness of [people] ... [w]hen used without restriction in liability policies, accident has been held not to exclude injuries resulting from ordinary, or even gross, negligence.'"  Stark Liquidation Co., 243 S.W.3d at 393, citing Wood, 980 S.W.2d at 49.

### Exclusion 19(o)

MUSIC claims Exclusion 19(o) of the Policy expressly excludes coverage for claims arising out of a criminal act and Leonberger pled guilty to a criminal act for his conduct causing the death of Hunter Pitt.  MUSIC contends this scenario removes the coverage for the Pitts' judgment.  MUSIC is incorrect.  MUSIC contends the Policy explicitly excludes coverage for claims that arise out of the criminal conduct of an insured, but the Pitts' claim arises out of the negligent conduct of an insured.  Therefore, MUSIC's assertion is irrelevant.

Exclusions are provisions that limit risks that otherwise might have been covered.  Todd v. Mo. United Sch. Ins. Council, 223 S.W.3d 156, 160 (Mo.banc 2007).  Exclusionary clauses in insurance policies are strictly construed against the insurer.  Burns v. Smith, 303 S.W.3d 505, 510 (Mo.banc 2010).  MUSIC bears the burden of showing the exclusion applies.  Id.

Exclusion 19(o) reads:

This Coverage Agreement does not apply to and we are not liable for:

Any fraudulent, dishonest, malicious, criminal or intentional wrongful act or omission by a Covered Party.

19

MUSIC contends Leonberger's guilty plea to second-degree involuntary manslaughter automatically vitiates coverage for the accident under the "criminal act" language in Exclusion 19(o).

We disagree. MUSIC is attempting to broaden its exclusion to swallow the coverage, and it is not allowed to do that. We strictly construe exclusions narrowly against the insurer, not broadly in favor of the insurer. Burns, 303 S.W.3d at 510; Dodson Int'l Parts, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh Pennsylvania, 332 S.W.3d 139, 146 (Mo.App. W.D. 2010). Further, the Pitts' judgment against Leonberger is grounded in and based upon his negligent acts. Count I of the Pitts' first amended petition alleged 16 ways in which Leonberger was negligent in causing the death of their son. The Pitts dismissed Count II of their first amended petition, which was premised on Leonberger's guilty plea to a charge of second-degree involuntary manslaughter. Therefore, their judgment was not premised on Leonberger's criminal conviction. The judgment was based on the negligence of Leonberger, MUSIC's insured.

No one maintains Leonberger intentionally ran over Hunter Pitt. Everyone has acknowledged it was an accident. That characterization puts the act squarely in the occurrence/accident coverage category of the Policy. The fact that the prosecutor, for whatever reason, decided to charge Leonberger with second-degree involuntary manslaughter for the occurrence does not change its nature, to-wit: that of a purely unintentional accident. MUSIC's attempt to deny coverage for the Pitts' judgment goes against Missouri's public policy to provide for the victims of accidents caused by its insureds.

Further, MUSIC cannot seem to bring itself to acknowledge an occurrence can be accidental and unintentional, yet charged as a crime. This is the dual nature of the accident in the instant case. Leonberger's accident triggered a second-degree involuntary manslaughter charge

20

by the State but did not change the nature of the act from negligent to intentional. Even Matthew Pitt stated at trial, "I know [Leonberger] didn't set out that day to intentionally kill my son. I mean, I – I know he didn't do this on purpose….And I'm not trying to ruin the man's life for it, but I believe, you know, there should be some consequences." The fact that Leonberger's accidental act had penal consequences for him does not justify denying the Pitts compensation for the death of their son. Although this is an issue of first impression in Missouri, other states have recognized this reasoning. "The mere fact that an act may have penal consequences does not necessarily mean that insurance coverage for civil liability arising from the same act is precluded by public policy." Public Serv. Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 399, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981). "The fact that the policy excludes criminal acts, but explicitly purports to cover 'negligently-inflicted bodily injury resulting in death,' creates an ambiguity with regard to coverage for involuntary manslaughter." 7A Couch on Ins. § 103:23, citing Graham v. James F. Jackson Associates, Inc., 84 N.C. App. 427, 352 S.E.2d 878 (1987). Ambiguities are resolved in favor of the insured, especially in insurance contracts. Mansion Hills Condominium Ass'n v. American Family Mut. Ins. Co., 62 S.W.3d 633, 637 (Mo.App. E.D. 2001).

Once an accident occurs, the static language of the Policy determines whether coverage applies. The existence of coverage under the Policy cannot morph and change based on the actions of the prosecutor. What if the local prosecutor decided to drop the charges against Leonberger after MUSIC had disclaimed coverage based on the bus accident being a "criminal act"? What if another identical accident happened with another bus driver covered by the MUSIC policy and the prosecutor decided not to charge that bus driver with a "crime"? There

21

would be coverage for the second bus driver, but not for Leonberger, for exactly the same acts. Such an outcome is untenable but is the result of MUSIC's reasoning.

We view, as did the wrongful death court, Leonberger's act in failing to train Hunter Pitt to safely disembark the bus and cross the street and as a result tragically striking him with the bus as purely accidental. The charge by the prosecutor months later cannot alter the fact Leonberger's action was wholly unintentional. The prosecutor likewise cannot have control over and change whether there is coverage for the act under the Policy or not. "Second-degree involuntary manslaughter" is merely a label applied to the act later, and coverage under the Policy cannot have a morphing nature depending on after-the-fact decisions of third parties not involved in the underlying accident. If we accepted such a changeable, uncertain nature of the Policy's stated coverage, as MUSIC urges us to do here, then we would have to likewise acknowledge the language in the Policy and the resulting coverage as ambiguous, because there would be a duplicity, indistinctness, or uncertainty in the meaning of the words used. Rodriguez v. General Accident Ins. Co. of Am., 808 S.W.2d 379, 382 (Mo.banc 1991). The ambiguity would be caused by not knowing whether there would be coverage or not by simply reading the Policy. The Policy would have to state there was coverage for accidents unless the prosecutor decides to charge the accident as a crime. The Policy here does not say that.

To determine the intended meaning of a contract, the court will not isolate ambiguous phrases, but will read the policy as a whole giving every clause some meaning if it is reasonably able to do so. Mazzocchio v. Pohlman, 861 S.W.2d 208, 210-11 (Mo.App. E.D. 1993). When there are two or more possible interpretations of a contract, the court will construe provisions limiting coverage against the insurer. Id. at 211.

22

The Policy at issue groups the descriptive word "criminal" with intentional, dishonest, malicious, and fraudulent acts. Thus, it is logical to construe the Policy's use of the word criminal as implying a deliberate and planned act. Second-degree involuntary manslaughter is by its nature and its nomenclature an unintentional crime that has penal consequences. "Voluntary manslaughter" embraces an intentional killing, and "involuntary manslaughter" extends to an unintentional killing while culpably negligent. State v. Elgin, 391 S.W.2d 341, 345 (Mo. 1965).

For the foregoing reasons, we find the Policy provides coverage for the accidental occurrence resulting in Hunter Pitt's wrongful death despite the second-degree involuntary manslaughter charge brought against Leonberger for the incident. Summary judgment was therefore correctly entered by the trial court in the Pitts' favor and denied against MUSIC on the issue of coverage. Point I is denied.

Points II – IV address three separate and alternative theories supporting summary judgment in the Pitts' favor given by the trial court. We affirm the trial court's grant of summary judgment for the Pitts if it is correct under *any* theory supported by the record developed below and presented on appeal. Oakley Fertilizer, Inc., 276 S.W.3d at 350. Here, we found summary judgment in the Pitts' favor is correct as a matter of law for the most basic of reasons, because the Policy provides coverage for the accident at issue, and the accident caused by Leonberger's negligent act is not disqualified from coverage based on the "fraudulent, dishonest, malicious, criminal or intentional wrongful act or omission" exclusionary clause.

Point II, discussing concurrent proximate cause, presumes the applicability of Exclusion 19(o) in the present case, which we have disavowed in Point I. As such, discussion of it would

not only be unnecessarily cumulative but contraindicative of our resolution of Point I. Point II is therefore denied.

Point III concerns Missouri's motor vehicle responsibility law, discussion of which also would be unnecessarily cumulative in light of the basic and fundamental principles set forth in Point I supporting coverage as a matter of law under the Policy for Leonberger's negligent acts and resulting accident. We likewise deny Point III as moot.

Although we need not examine the fourth basis supporting summary judgment for the Pitts, *see* Oakley Fertilizer, Inc., 276 S.W.3d at 350, we discuss it because it is of special interest to the Court in light of MUSIC's maneuverings throughout these proceedings from beginning to end that may equitably preclude it by virtue of its own actions from being entitled to dispute coverage in the first place.

Point IV – Waiver and Estoppel

In its fourth point, MUSIC contends the trial court erred in granting the Pitts' motion for summary judgment and denying its motion for summary judgment on the issue of coverage based on its holding MUSIC waived and is estopped from relying on Exclusion 19(o), because the Pitts failed to show the doctrines of waiver and estoppel apply to this case, in that waiver and estoppel cannot be used to create coverage when it does not otherwise exist; nothing in MUSIC's conduct, including hiring defense counsel to defend Leonberger in the criminal action, established that MUSIC intended to relinquish a known right; MUSIC did not wait an unreasonable amount of time before issuing its reservation of rights notice; and Leonberger was not lulled into detrimental reliance and did not otherwise change his position based on MUSIC's conduct.

Although MUSIC must challenge *all* grounds on which the trial court ruled against it to establish grounds for reversal, we may affirm the trial court's grant of summary judgment for the Pitts under any *one* of the theories supported by the record developed below and presented on appeal. McGathey v. Matthew K. Davis Trust, 457 S.W.3d 867, 878 (Mo.App. W.D. 2015). An order of summary judgment may be affirmed under any theory that is supported by the record. Burns v. Smith, 303 S.W.3d 505, 509 (Mo.banc 2010). Because coverage for the accident causing Hunter Pitt's death exists under the Policy's general liability coverage for accidents caused by its covered person Leonberger, and we held in Point I that Section 19(o)'s exclusion of criminal acts from coverage does not apply to the accident caused by Leonberger resulting in Hunter Pitt's death as a matter of law, it is not necessary for us to find whether MUSIC waived and is estopped from relying on Exclusion 19(o) to deny coverage. Oakley Fertilizer, Inc., 276 S.W.3d at 350. Likewise, this is not a circumstance in which waiver is being employed to *create* what would otherwise be nonexistent coverage because it is the Policy itself that provides coverage, as discussed in Point I. Nevertheless, we discuss waiver *ex gratia* because MUSIC's actions are particularly noteworthy in this case.

Waiver is founded upon the intentional relinquishment of a known right. Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384, 386 (Mo.banc 1989). It is the insurer's unequivocal conduct, knowingly contrary to the claim provisions in its contract, which betrays the insurer's purpose to relinquish its right to rely on the contractual language. Id. at 387. If the terms of the policy have been waived by the conduct and course of business of the insurance company, they no longer constitute any part of the policy. Id. (citing Block v. U.S. Fidelity & Guaranty Co., 290 S.W. 429, 437 (Mo. 1926). "It is defending an action with knowledge of noncoverage under a policy of liability insurance without a non-waiver or reservation of rights agreement that

25

precludes the insurer from subsequently setting up the fact and defense." Mistele v. Ogle, 293 S.W.2d 330, 334 (Mo.1956).

Unlike estoppel, prejudice plays no part in long-accepted definitions of waiver; it is the voluntary relinquishment of the right to rely on the contractual provision which forms the basis for waiver. Brown, 776 S.W.2d at 388. MUSIC was aware of Exclusion 19(o) and its reference to "criminal wrongful acts" at the time the prosecutor asserted the charge against Leonberger. Yet, even though its policy did not provide for such coverage, MUSIC provided Leonberger with and paid for a defense against those charges. That is, MUSIC consciously and unequivocally took an action that was inconsistent with both the coverage provisions of the Policy and Exclusion 19(o) when it provided Leonberger with a criminal defense. This is the very definition of waiver. Id.

Coverage clearly existed as evidenced by the fact MUSIC accepted coverage for the accident almost immediately after it occurred and continued to cover Leonberger unconditionally for a year and a half after it. While not central to this Court's holding as to waiver, the Court notes that Missouri recognizes the existence of a fiduciary relationship between an insurer and insured. Grewell v. State Farm Mut. Auto. Ins. Co., 162 S.W.3d 503, 508-09 (Mo.App. W.D. 2005). This relationship arises out of the trust that is reposed with respect to the property or business affairs of another. Id. at 509. MUSIC, who was entrusted to defend the civil claim asserted against Leonberger and who volunteered to defend the criminal charge, was acting under a fiduciary capacity. Id. Having assumed that position of trust, MUSIC could not then turn around and deny coverage to Leonberger for accepting the advice of the very attorney it had provided for him. Additionally, MUSIC's decision to continue defending Leonberger for several

26

months after the plea without reservation now precludes MUSIC from relying upon Exclusion 19(o).

Upon proper notice to the insured, Missouri law permits an insurer to defend its insured but reserve the right to later disclaim coverage. Truck Ins. Exchange v. Prairie Framing, LLC, 162 S.W.3d 64, 88 (Mo.App. W.D. 2005). An insurer owes the insured a duty to assert a proper reservation of rights that is timely, clear, and fully informs the insured of its position. Kinnaman-Carson v. Westport Ins. Corp., 283 S.W.3d 761, 765 (Mo.banc 2009). The insurer must conduct an investigation and analysis of the claim with reasonable diligence and must promptly notify the insured of its position once the process is complete. Id. Defending an action with knowledge of non-coverage under a policy of liability insurance without a proper and effective reservation of rights in place will preclude the insurer from later denying liability due to non-coverage. Id.

The facts and circumstances of when MUSIC became aware of Leonberger's guilty plea and the actions it took in furtherance of his defense after that plea are not in dispute. On March 30, 2011, MUSIC learned a local prosecutor was considering filing a charge against Leonberger. In May of 2011, the prosecutor charged Leonberger. In October of 2011, MUSIC learned Leonberger would plead guilty; Leonberger did plead guilty on November 21, 2011. MUSIC issued its reservation of rights letter on April 4, 2012. However, it did not mail that letter to Leonberger's address. Neither Leonberger nor Noce, his counsel, learned of the reservation of rights until July of 2012, more than 15 months after MUSIC first became aware the Callaway County prosecuting attorney was considering charges; more than 13 months after MUSIC hired a criminal attorney to advise and defend Leonberger; more than 9 months after MUSIC learned

27

Leonberger would plead guilty; more than 7 months after Leonberger actually pled guilty; and nearly 6 months after MUSIC claims its interests became adverse to Leonberger.

Even several months after the plea, MUSIC had still yet to tell Leonberger its interests were adverse and it even hired Noce to represent Leonberger in the civil case, who filed an Answer on his behalf. These undisputed facts create a prototypical picture of an insurer deciding to defend an action with knowledge of the potential for non-coverage under the policy, all the while leaving Leonberger unaware − because MUSIC failed to inform him − of the possible withdrawal of his insurance coverage based upon the plea to the manslaughter charge. MUSIC's hiring a civil defense attorney for Leonberger and continuing his defense without reservation for more than 7 months after Leonberger's plea precludes MUSIC from now denying coverage on that basis. Kinnamon-Carson, 283 S.W.3d at 765.

Based on the foregoing, Point IV is denied.

Point V – Extra-Contractual Damages

In its fifth point, MUSIC avers the trial court exceeded its authority and erred in entering judgment against MUSIC in the amount of $15,847,076.43, rather than the remaining Policy limits of $2,107,266, because the judgment included extra-contractual damages which were not available in this Rule 90 proceeding, in that a Rule 90 garnishment in aid of execution is an *in rem* proceeding limited to the collection of property, effects, or money that the garnishee has a present obligation to pay the defendant and does not permit an award of extra-contractual or consequential damages against the garnishee arising from an alleged breach of a duty owed to the defendant, and the only money MUSIC could have owed under the Policy was the remaining limits of $2,107,266.

28

When an insurer is bound to protect its insured from liability, it is bound by the liability determination in the litigation to which the insured is a party, so long as the insurer had the opportunity to control and manage the litigation. Columbia Cas. Co. v. HIAR Holding, L.L.C., 411 S.W.3d 258, 264 (Mo.banc 2013). The standard is whether the insurer had the *opportunity* to control and manage the litigation, not whether the insurer had the *duty* to control and manage the litigation. Id. (emphasis added). Here, MUSIC had a full and fair opportunity to litigate and defend in this case and thus is bound by the liability determination to which Leonberger was a party. Id. at 265. The garnishment court explicitly found MUSIC breached its duties to Leonberger and is thus liable for the entire underlying judgment under Columbia Cas. Co., 411 S.W.3d at 265. However, the recent case of Allen v. Bryers, No. SC95358; 2016 WL 7378560 *14 (Mo.banc December 20, 2016), without abrogating Columbia Cas. Co., suggests a bad faith finding must be made, not merely a breach of duty, in order to be held liable for extra-contractual damages. Upon briefing of this recent case Allen v. Bryers, the Pitts acknowledge this as a possible interpretation and thus concede a compromise on this point.

As such, we limit the garnishment court's award of damages to the contractual limit of the Policy until a bad faith finding is made.[5] See Allen v. Bryers, No. SC95358; 2016 WL 7378560 *14 (Mo.banc December 20, 2016).

Point V is granted to the extent the judgment is modified to be limited to the remaining policy limits of $2,107,266 plus post-judgment interest accumulated to date.

---

[5] This is currently being litigated in Leonberger v. MUSIC and UE, City of St. Louis Circuit Court Case No. 1322-CC01344.

In its sixth and seventh points, MUSIC argues prejudgment interest is not available in Rule 90 proceedings because garnishment in aid of execution is an *in rem* proceeding limited to the collection of property, effects, or money that the garnishee has a present obligation to pay; the Pitts failed to plead or prove their entitlement to an award of prejudgment interest; the court's award of 9% prejudgment interest is inapplicable because only the tort action rate of 5.25% should apply because the underlying action sounds in tort to which the current garnishment action is only ancillary; and 9% coupled with the original judgment's 5.25% interest results in an improper double recovery of interest at a rate of over 15%.

The 5.25% interest is post-judgment interest entered by the wrongful death court in the Pitts' civil tort judgment against Leonberger on December 21, 2012. The garnishment court whose judgment is on appeal before this Court did not impose, order, or adjudge that judgment or that interest at all, much less against MUSIC, and therefore it is not on appeal before us for review. In any event, in reviewing it *ex gratia* we find no error in it. The imposition of any interest from the date of judgment until payment is fixed and determined by statute. Kelly v. Bass Pro Outdoor World, L.L.C., 426 S.W.3d 675, 678 (Mo.App. E.D. 2013). Section 408.040.2 RSMo Supp. 2005 provides in part: "in tort actions, interest shall be allowed on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until full satisfaction." The purpose behind this statute "is to compensate a judgment creditor for the judgment debtor's delay in satisfying the judgment pending the judgment debtor's appeal." Peterson, 460 S.W.3d at 413. Read more broadly, "post-judgment interest is awarded on the theory that it is a penalty for delayed payment of the judgment." Id.

The judgment the wrongful death court entered against Leonberger was based upon a tort claim. Thus, the court properly awarded post-judgment interest against Leonberger at the rate of 5.25% per annum pursuant to Section 408.040.2 RSMo Supp. 2005.[6] Post-judgment interest shall be allowed on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until full satisfaction. Good Hope Missionary Baptist Church v. St. Louis Alarm Monitoring Co., Inc., 358 S.W.3d 528, 535 (Mo.App. E.D. 2012).

The garnishment court did order 9% prejudgment interest on its final judgment awarded to the Pitts as Garnishors against MUSIC as garnishee in the instant proceeding. The 9% prejudgment interest was issued by the garnishment court on the original judgment plus the post-judgment interest accumulated to date from the time the original judgment became final and payable on January 21, 2013, but unpaid by MUSIC.

Once their wrongful death judgment became final, the Pitts began this garnishment proceeding, where they stand in Leonberger's shoes and assert his rights against MUSIC under the insurance contract. A judgment creditor stands in the shoes of the insured and has rights no greater and no less than the insured's rights would have been if the insured paid the judgment and then sought reimbursement from the insurer. James v. Paul, 49 S.W.3d 678, 683 (Mo.banc 2001). This garnishment proceeding is an action upon a contract to which Section 408.040.2 applies.[7] James, 49 S.W.3d at 684 ("the garnishment proceeding here is not a tort action against

---

[6] Currently, Section 408.040.3 RSMo Supp. 2014 provides for interest in tort actions. It provides:
> Notwithstanding the provisions of subsection 2 of this section, in tort actions, interest shall be allowed on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until full satisfaction. All such judgments and orders for money shall bear a per annum interest rate equal to the intended Federal Funds Rate, as established by the Federal Reserve Board, plus five percent, until full satisfaction is made.

[7] Section 408.040.2 RSMo Supp. 2014 provides:
> In all nontort actions, interest shall be allowed on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until satisfaction be made by payment, accord or sale of property; all such judgments and orders for money upon contracts

Paul but an action derivative of Paul's contract with State Farm."). Because this garnishment proceeding involves a claim upon a contract, the trial court properly awarded prejudgment interest at the contract rate of 9% per annum pursuant to Section 408.040.2. However, the 9% prejudgment interest, in accordance with our resolution of Point V, only accrues on the contractual limit of liability at this point in time. When the wrongful death judgment became final, the contractual amount owed by MUSIC under the Policy became fixed, liquidated and readily determinable. Prejudgment interest is awardable on liquidated claims, Watters, 136 S.W.3d at 111; and is not a matter of court discretion, rather it is compelled. Comens v. SSM St. Charles Clinic Medical Group, Inc., 335 S.W.3d 76, 82 (Mo.App. E.D. 2011). Finally, it is proper for interest to accrue on a judgment even though the judgment itself includes an amount of interest. Good Hope Missionary Baptist Church, 358 S.W.3d at 535; Boatmen's First Nat. Bank of Kansas City v. Bogina Petroleum Engineers, 794 S.W.2d 703, 706 (Mo.App. W.D. 1990).

The garnishment court correctly imposed the 9% rate of prejudgment interest set forth in Section 408.040.2 RSMo Supp. 2014 on its judgment as modified to conform to the contractual limit of liability as held in Point V. MUSIC does not and cannot appeal from the 2012 wrongful death judgment in which the 5.25% post-judgment interest was imposed. Points VI and VII are denied in part and granted in part accordingly.

---

bearing more than nine percent interest shall bear the same interest borne by such contracts, and all other judgments and orders for money shall bear nine percent per annum until satisfaction made as aforesaid.

<u>Conclusion</u>

The trial court's orders and judgments are affirmed in part and modified in part and this cause is remanded for further proceedings and recalculations by the garnishment court as set forth in this opinion.

_____
SHERRI B. SULLIVAN, P.J.

Roy L. Richter, J., and
Colleen Dolan, J., concur.